**TAXPAYERS WATCHDOG, INC., et al., Appellants,**

v.

**Ralph L. STANLEY, Administrator, Urban Mass Transportation Administration, et al.**

No. 86–5714.

United States Court of Appeals, District of Columbia Circuit.

May 19, 1987.

William T. Coleman, Jr., Donald T. Bliss and Jacob M. Lewis, Los Angeles, Cal., were on appellee's, Southern California Rapid Transit Dist., motion for summary affirmance.

Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence, Edith S. Marshall and Mark E. Nagle, Asst. U.S. Attys., Washington, D.C., were on the federal appellee's motion for summary affirmance.

Nina Bang-Jensen, Washington, D.C., and Robert D. Donaldson, Los Angeles, Cal., were on the oppositions.

Before BORK, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion PER CURIAM.

## ON MOTIONS FOR SUMMARY AFFIRMANCE

PER CURIAM.

Appellee Ralph Stanley, Administrator of the Urban Mass Transportation Administration ("UMTA") and intervenor Southern California Rapid Transit District ("SCRTD") have each moved this court for summary affirmance of an order of the district court granting summary judgment to UMTA. Because the district court was correct in granting judgment to UMTA, the motions are granted and the order on appeal is summarily affirmed.

On September 3, 1986, appellant Taxpayers Watchdog ("Taxpayers") filed a complaint in the district court seeking to enjoin UMTA from disbursing $225.6 million in federal funds to SCRTD for the construction of a metro rail system in Los Angeles, California. The complaint alleged that UMTA had contracted with SCRTD to release federal funds for construction of a four mile subway system without first complying with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (1982) ("NEPA").

Following an expedited hearing on September 5, the district court temporarily restrained UMTA from releasing the funds. Shortly thereafter, SCRTD intervened as a defendant, and along with UMTA, opposed the request for injunctive relief and moved for summary judgment. In response, Taxpayers also moved for summary judgment. Following a hearing on October 1, the restraining order was dissolved and judgment entered for UMTA. This appeal followed.

In 1978, in the hope of securing federal funds to improve public transportation in southern California, SCRTD presented to UMTA a document entitled "Draft Alternatives Analysis/Environmental Impact Statement/Environmental Impact Report." ("Draft EIS"). The Draft EIS presented eleven mass transit alternatives designed to improve public transportation in and around the city of Los Angeles. The Draft EIS was approved by UMTA in May, 1979, and made available for review and public comment during the following month. In September of that year, the SCRTD adopted "Alternative II" as its "preferred alternative." [1] Alternative II was an 18.6 mile subway line between the Los Angeles central business district and North Hollywood.

In April, 1980, after public hearings, the SCRTD and UMTA adopted the first tier environmental documentation. The SCRTD then began the preliminary engi-

---

1. The UMTA has developed a two-step procedure for reaching funding decisions. In the first stage, the local transit authority analyzes alternatives and prepares a first tier environmental impact statement ("EIS"). Following this "alternatives analysis", the applicant designates the "preferred alternative" it proposes to implement. A public hearing is then held. Following the hearing, the UMTA may grant federal funds to the local applicant for design and engineering of the preferred alternative.

The second stage follows completion of the preliminary design and engineering plan. The applicant prepares a site-specific "second tier" EIS analyzing the effects of the chosen alternative. After UMTA circulates the final EIS for comments, the applicant prepares a capital grant application for the construction of the preferred alternative and holds a public hearing thereon. The UMTA then decides whether to provide funds for the actual construction of the transit system. *See Rapid Transit Advocates v. S. Cal. Rapid Transit,* 752 F.2d 373 (9th Cir. 1985).

neering phase of the project, analyzing in detail the effects of the preferred alternative.

By November of 1983, the SCRTD published its "second tier" or "final" EIS. The final EIS analyzed four alternative plans for the metro rail project: (a) the locally preferred alternative of 18.6 miles of entirely below ground tracks; (b) the same 18.6 mile system with some aerial components; (c) the "minimum operable segment" of 8.8 miles, and (d) a "no project" alternative. Shortly thereafter, the underground 18.6 mile plan was adopted for final design and construction, and UMTA approved the final EIS.

In 1984, however, the federal government dramatically curtailed the funding available for local transit projects. Thus, UMTA could not commit itself to provide funds for the 18.6 mile or even the 8.8 mile systems. In response, SCRTD developed a fifth alternative. This alternative consisted simply of the first four miles of the 18.6 mile system. It was designated as the truly "minimum operable segment" or MOS-1.

In June, 1984, SCRTD requested immediate funding for MOS-1, and asked UMTA to prepare an Environmental Assessment ("EA") for the project. SCRTD had already prepared its own preliminary environmental study. SCRTD concluded that MOS-1 would make a "viable contribution to the greater Los Angeles urban transportation infrastructure" and would ease congestion in the city's central business district.

UMTA issued its EA in August, 1984. The agency noted that "[b]ecause of continuing uncertainty of federal capital funds, this analysis has been undertaken to insure that the 4 mile project would be an independent operable segment." The EA addressed the impact of a four mile system, particularly the effect of a terminal station at the intersection of Wilshire Boulevard and Alvarado Street. In all other respects, MOS-1 was identical to the first four miles of the previously approved 18.6 mile system. The EA also addressed a "no project" alternative. The agency conclud-

ed that even a shortened four mile system was preferable to no rail system at all. UMTA concluded that MOS-1 would be "worth the investment when weighed against the benefits ... increased accessibility and decreased total number of vehicle miles traveled in the [central business district] area." The environmental review process for MOS-1 was completed in November, 1984, with the issuance of a Finding of No Significant Impact ("FONSI") by UMTA.

Unfortunately, the problems associated with the construction of a rapid rail system in Los Angeles did not end there. Four months after UMTA issued the FONSI for MOS-1, an explosion of methane gas occurred several miles from the proposed terminal station at Wilshire and Alvarado. This explosion occurred in the Fairfax Avenue section of Los Angeles, through which part of the 18.6 mile route beyond MOS-1 was to pass. As a result of the explosion, a local task force report labeled the area a "potential risk zone."

When word of the explosion reached Washington, Congress promptly prohibited the use of any federal funds for construction of any part of the Los Angeles subway system unless SCRTD made a commitment to UMTA that no part of the system would tunnel into or through any risk zone identified by the task force. This congressional action forced SCRTD to scrap the proposed 18.6 mile route and develop a new rail system that would not pass through the Fairfax Avenue area. In June of 1986, SCRTD had identified four potential alternative routes, all of which would utilize MOS-1. The process of developing and choosing a single alternate extension to MOS-1 is still underway. On August 27, UMTA signed a full funding contract with SCRTD, agreeing to release $225 million for the construction of MOS-1.

■ A party seeking summary disposition bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified. *See Walker v. Washington,* 627 F.2d 541, 545 (D.C.Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 292 (1980). To summarily affirm

an order of the district court, this court must conclude that no benefit will be gained from further briefing and argument of the issues presented. *Sills v. Bureau of Prisons,* 761 F.2d 792, 793–94 (D.C.Cir. 1985). In addition, this court is now obligated to view the record and the inferences to be drawn therefrom "in the light most favorable to [taxpayers]." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

Section 102(2)(c) of NEPA, 42 U.S.C. § 4332(2)(c), directs government agencies "to the fullest extent possible"

> to include in every recommendation or report on proposals for legislation and other Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on
>
> (i) the environmental impact of the proposed action, [and]
>
> * * * *
>
> (iii) alternatives to the proposed action.

■■ Thus, proposals for "major federal action" "significantly affecting the quality of the environment" must be accompanied by a detailed discussion of the reasonably foreseeable effects on the environment of reasonable alternative courses of action. *Natural Resources Defense Council, Inc. v. U.S. Nuclear Regulatory Comm'n,* 606 F.2d 1261, 1269 (D.C.Cir. 1979). However, if the responsible official makes a threshold determination that the proposed action will have an insignificant effect upon the environment, an EIS will not be required. *Asphalt Roofing Mfg. Ass'n v. Interstate Commerce Comm'n,* 567 F.2d 994, 1004 (D.C.Cir.1977). An agency's decision not to issue an EIS for an activity it claims has an insignificant impact may be reversed only if that decision is arbitrary or capricious. · *West Chicago, Ill. v. U.S. Nuclear Regulatory Comm'n,* 701 F.2d 632, 651 (7th Cir.1983).

Taxpayers does not challenge the "substantive adequacy of the environmental documentation prepared for the original 18.6 mile subway, as that original documentation once related to MOS–1." In addition, it does not claim that UMTA acted arbitrarily or capriciously by failing to issue a separate full-blown EIS on MOS–1 in 1984. Further, it neither challenges the substantive adequacy of the August, 1984 EA, nor suggests that the 1985 methane explosion in any way threatens the safety of the MOS–1 system.

Rather, Taxpayers claims only that the entire, as yet undetermined, subway system must be considered and a "determination ... made whether the small part of the larger project has been improperly segmented from the whole." It argues that MOS–1 is not an independent project but is now, and always has been, conceived of as the first leg of a rail line extending past the Wilshire/Alvarado station to North Hollywood. Thus, the entire metro rail project is said to be the "major federal action" and MOS–1 is said to have been improperly segmented therefrom, frustrating adequate environmental review.

■ "Piecemealing" or "Segmentation" allows an agency to avoid the NEPA requirement that an EIS be prepared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts, each involving action with less significant environmental effects. *West Chicago, Ill. v. U.S. Nuclear Regulatory Comm'n,* 701 F.2d at 650. The rule against segmentation was developed to insure that interrelated projects the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions. *See generally, Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430 (5th Cir.1981); *Swain v. Brinegar,* 542 F.2d 364 (7th Cir. 1976) (*en banc*).

■ The rule against segmentation, however, is not required to be applied in every situation. To determine the appropriate scope for an EIS, courts have considered such factors as whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects. *Piedmont Heights Civic Club,*

*Inc. v. Moreland,* 637 F.2d at 439. *See also Swain v. Brinegar,* 542 F.2d at 369; *Daly v. Volpe,* 514 F.2d 1106, 1108–09 (9th Cir.1975).

The district court concluded that "MOS–1 is an independent project that would make a much needed contribution to Los Angeles' transit system." That conclusion was based upon the uncontradicted evidence offered by SCRTD that MOS–1 would provide a much needed service to the central business district ("CBD") of a city that will shortly face "debilitating daily gridlock."

■ The unrebutted evidence presented to the district court demonstrated that MOS–1 is a four mile rail system providing service to the CBD of Los Angeles and close-in residential areas. In the Northeast, it will connect with Union Station, the city's main railroad terminal, and from there provide easy access to the El Monte busway which serves the San Gabriel valley. In the South, MOS–1 will connect with the Long Beach and Century Freeway light rail systems. It will intersect major bus lines and provide easier access to the CBD for those who live in the densely populated Wilshire/Alvarado area. Further, it was estimated that MOS–1 will reduce by one fourth the current travel time from one end of the CBD to the other. Based upon this unchallenged evidence, the district court properly concluded that MOS–1 has substantial independent utility and has logical endpoints.

In addition, because of its central location connecting downtown Los Angeles with outlying residential areas, the district court concluded that MOS–1 was particularly well suited for future expansion. Any rapid rail system that would be constructed in the future would have to provide service to the CBD in much the same manner as MOS–1. Thus, MOS–1 does not foreclose alternative routes of expansion, nor does it foreordain a particular choice. This flexibility was demonstrated by the fact that SCRTD currently has under consideration no less than four possible extensions of MOS–1 to the San Fernando Valley. Moreover, although expansion of the rail system may be desirable, the substan-

tial utility of MOS–1 as an independent rail segment serving the CBD does not require the construction of additional rail miles to justify the building of MOS–1 alone. Thus, many alternatives, including a "no-build" option, are preserved by construction of MOS–1.

Finally, the district court concluded that funding of MOS–1 would not irretrievably commit federal funds for the construction of any proposed extension. That conclusion is clearly correct. Neither the California statute that mandates construction of a subway system in the San Fernando Valley within one year of the start of MOS–1, nor the Full Funding Contract, which requires SCRTD to plan to fund and construct an extension beyond MOS–1, can compel UMTA to underwrite any future construction without complying with NEPA. Assuming that an extension to MOS–1 will indeed be built, and that federal funds will be sought to help finance the construction, the environmental consequences of that construction must be adequately analyzed before UMTA may underwrite the project. Neither the contract nor a state statute may "irretrievably" commit UMTA to disburse federal funds if to do so would violate NEPA.

Taxpayers is correct when it alleges that MOS–1 has always been, and still is, envisioned as the first leg of a larger system. It is also correct in pointing out the dangers that may arise if a project is segmented into overly narrow portions for environmental review. Environmental assessment on less than a systemwide scope may, in certain situations, lead to evaluation of segments in isolation of one another, thereby creating a misleading picture of the impact of the project as a whole. The record is barren, however, of any facts that would suggest that such a danger exists here.

In addition, transit officials must have some flexibility in meeting the public transportation demands of a large metropolitan area. Large public transportation projects, such as the one involved here, are in the planning and development stage over a long period of time. Officials need flexibility to allow for modifications to meet un-

forseen developments, including the availability of state and federal funding. The SCRTD should not be precluded from utilizing a portion of a public transportation project that has passed environmental muster, simply because the unavailability of federal funds has made the construction of the original project presently unfeasible.

Taxpayers does not allege that the environmental review for MOS–1 is in any way deficient except to allege that it should not be viewed in isolation from what they believe to be the true metro rail project. The district court was correct in concluding, however, that MOS–1 is a separate, viable transportation system with utility independent of any further construction. It does not foreclose future options, and if it remains the lone rail system constructed in Los Angeles, will nevertheless provide a much needed service. Accordingly, the district court was correct in granting summary judgment to UMTA, and that decision is summarily affirmed.