# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 13, 2015　　　　　Decided June 28, 2016

No. 14-1275

SIERRA CLUB AND GALVESTON BAYKEEPER,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

AMERICAN PETROLEUM INSTITUTE, ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Nathan Matthews* argued the cause for petitioners. With him on the briefs was *Sanjay Narayan*.

*Robert H. Solomon*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *David L. Morenoff*, General Counsel, and *Karin L. Larson*, Attorney.

*Jonathan S. Franklin* argued the cause for respondent-intervenors Freeport LNG Development, L.P., *et al*. With him on the brief were *Lisa M. Tonery* and *Charles R. Scott*.

*Catherine E. Stetson* was on the brief for intervenor American Petroleum Institute in support of respondent. *Stacy R. Linden* and *Benjamin Norris IV* entered appearances.

Before: ROGERS, GRIFFITH, and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: The Sierra Club and Galveston Baykeeper (the "Associations") take issue with the Federal Energy Regulatory Commission's decision authorizing Freeport LNG Development, L.P. to redesign its liquefied natural gas terminal in Texas to support export operations. Specifically, the Associations argue that the Commission's analysis of the proposal's impact on the environment ran afoul of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq*. We hold that the Associations have standing to press their challenges to the Commission's orders and that their case is not moot, but we deny the petition for review on the merits. To the extent the Associations complain about the environmental consequences of *exporting* natural gas from Freeport's terminal, those objections should be raised in the pending challenge to the Department of Energy's order authorizing Freeport to export natural gas. On the narrower question of whether the Commission's analysis of the non-export-related environmental consequences of Freeport's proposal itself complied with NEPA, we find no error in the Commission's analysis that would rise to the level of arbitrary or capricious decision-making.

3

**I**

**A**

Export authorizations for natural gas implicate a tangled web of regulatory processes. The Department of Energy maintains exclusive authority over the export of natural gas as a commodity. 42 U.S.C. § 7151(b). The Natural Gas Act, though, authorizes the exportation of natural gas from the United States unless the Department specifically determines that doing so "will not be consistent with the public interest." 15 U.S.C. § 717b(a). In addition, the Department of Energy's determination of the public interest in the export of natural gas depends on the country to which the gas will be exported. If it is a country with which the United States has a "free trade agreement requiring national treatment for trade in natural gas," the Natural Gas Act makes the decision for the Department, because the Act "deem[s]" export "to be consistent with the public interest, and applications for such * * * exportation shall be granted without modification or delay." *Id.* § 717b(c). On the other hand, if the gas will be exported to a country with which the United States does not have such a trade agreement, the Department must independently determine whether such exports would be inconsistent with the public interest. *See id.* § 717b(a).[1]

---

[1] Currently, the United States has natural gas free-trade agreements with Australia, Bahrain, Canada, Chile, Colombia, the Dominican Republic, El Salvador, Guatemala, Honduras, Jordan, Mexico, Morocco, Nicaragua, Oman, Panama, Peru, the Republic of Korea, and Singapore. *See* J.A. 302; U.S. Department of Energy, Office of Fossil Energy, How to Obtain Authorization to Import and/or Export Natural Gas and LNG, http://energy.gov/fe/services/ natural-gas-regulation/how-obtain-authorization-import-andor-export-natural-gas-and-lng (last visited June 27, 2016).

The Department has delegated to the Federal Energy Regulatory Commission the authority to "[a]pprove or disapprove the construction and operation of particular [export] facilities, the site at which such facilities shall be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of * * * exit for [natural gas] exports." U.S. Department of Energy, Delegation Order No. 00-004.00A, § 1.21.A (May 16, 2006); *cf.* 15 U.S.C. § 717b(e)(1) ("The [Federal Power] Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG [liquefied natural gas] terminal."). As a result, if an operator of a natural gas terminal like Freeport wants to export natural gas and has to construct or modify facilities to do so, it must obtain authorizations from both the Department of Energy (to export) and the Commission (to construct and to operate the necessary facilities). And if the export will be to a natural gas free-trade country, the only potential public-interest analysis ever made is the Commission's when approving the "siting, construction, expansion or operation of an LNG terminal." 15 U.S.C. § 717b(e)(1).

In addition to those public-interest determinations, authorizations to export natural gas also require an environmental review under NEPA. *See* 42 U.S.C. § 4332(2)(C). When, as here, the agency determines that the action under review is a "major Federal action[]" that will "significantly affect[] the quality of the human environment," the agency must prepare a detailed Environmental Impact Statement that addresses (i) the environmental impact of the proposed action, (ii) any "adverse environmental effects" that "cannot be avoided" if the proposal is implemented, (iii) available alternatives to the proposed action, (iv) the "relationship between local short-term uses of [the]

environment and the maintenance and enhancement of long-term productivity," and (v) any "irreversible and irretrievable commitments of resources" that "would be involved in the proposed action should it be implemented." *Id*.

In analyzing the environmental impact of a project, NEPA obligates the agency to consider not just the "direct" environmental effects of the proposed action that "are caused by the action and occur at the same time and place," but also the action's "indirect" environmental effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8. The agency must also consider the action's "cumulative impact"—that is, the impact on the environment that would result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.

Notwithstanding the limited scope of the Commission's delegated authority under the Natural Gas Act, that Act designates the Commission to be "the lead agency for the purposes of coordinating all applicable Federal authorizations and for the purposes of complying with the National Environmental Policy Act." 15 U.S.C. § 717n(b)(1); *see also* 42 U.S.C. § 7172(a)(2)(B). As a result, the Department of Energy participates in the NEPA process only as a "cooperating agency," 40 C.F.R. § 1501.6(b), while the Commission is ultimately responsible for "supervis[ing] the preparation of [the] environmental impact statement," *id.* § 1501.5. That arrangement makes it possible for the Department to adopt the Commission's environmental analysis as its own for purposes of any additional NEPA review triggered by an export-authorization request. But the

Department must independently review the Commission's work and conclude that the Department's own "comments and suggestions have been satisfied." *Id.* § 1506.3(c).

**B**

In 2004, the Commission authorized Freeport to site, construct, and operate a liquefied natural gas import terminal on Quintana Island in Brazoria County, Texas. That facility was placed into service in 2008.

As it happens, an increase in the availability of cheap domestic natural gas during the last decade caused the market for importing gas to decline. As a result, Freeport shifted its operations toward exporting and, in 2009, obtained authorization from the Commission to operate its existing terminal facility for both exporting and importing natural gas on a short-term basis. In 2011 and 2012, Freeport sought authorization from the Commission both to modify its facilities to better support gas exports, and to construct additional gas liquefaction facilities to supplement its export operations. (Throughout this opinion, we refer to those two projects collectively as the "Freeport Projects.").

As required by the Natural Gas Act and NEPA, the Commission undertook an extensive environmental review of the Freeport Projects. Deeming the two projects to be "connected actions," 40 C.F.R § 1508.25, the Commission prepared a single Environmental Impact Statement. The Department of Energy, the Environmental Protection Agency, the Department of Transportation, the U.S. Army Corps of Engineers, and the National Oceanic and Atmospheric Administration all participated in that consolidated review as "cooperating agencies." J.A. 679.

Meanwhile, in 2010 and 2011, Freeport separately sought authorization from the Department of Energy to export natural gas. The Department approved Freeport's request for free-trade agreement countries in February 2011, and conditionally approved Freeport's application with respect to non-free trade agreement countries in May and November 2013. The conditional order explained that the Department of Energy would participate in the Commission's ongoing environmental review of the Freeport Projects as a cooperating agency, and that the Department's final authorization would be contingent on satisfactory completion of that environmental review process.

The Commission released its Final Environmental Impact Statement in June 2014. That Statement found that the Freeport Projects "would result in some adverse environmental impacts," but that those impacts would be "mostly temporary and short-term" as long as Freeport implemented mitigation procedures proposed by the Commission. The following month, the Commission conditionally authorized both Freeport Projects. After considering the Final Environmental Impact Statement and all substantive public comments, the Commission determined that, if Freeport complied with specified environmental conditions, the Projects would not be inconsistent with the public interest.

The Associations intervened in the Commission's proceeding and timely sought rehearing. As relevant here, they argued that the Commission failed (i) to consider the indirect environmental effects of a possible increase in domestic natural gas production being induced by the Freeport Projects, and (ii) to analyze the cumulative environmental effects of those Projects with "the many proposed export projects" across the country, including, "at a

minimum," those already authorized and "all other export projects to have received conditional authorization from" the Department of Energy.  J.A. 1250, 1273.

The Commission denied the Associations' petition for rehearing.  The Commission rejected the argument that increased domestic natural gas production was a causally related or reasonably foreseeable indirect effect of the Freeport Projects.  The Commission also determined that the cumulative impact of all other authorized or pending export projects nationwide fell beyond the regulatory definition of "cumulative impact."

The next day, the Department of Energy issued its final order authorizing Freeport to export natural gas to non-free trade agreement countries.  The Department reconfirmed its findings from the earlier conditional order, and also addressed "the remaining issue: the potential environmental impacts" from Freeport's export proposals.  J.A. 1403.  The Department concluded that "the proposed exports have not been shown to be inconsistent with the public interest."  *Id*.  The Department subsequently denied the Associations' petitions for reconsideration.[2]

## II

We start where we must always start:  "with the question of our jurisdiction."  *Brotherhood of Locomotive Eng'rs and Trainmen v. Surface Transp. Bd.*, 457 F.3d 24, 27 (D.C. Cir. 2006).  The Commission argues that we lack jurisdiction because the Associations do not have standing, and because

---

[2] The Associations' petition for review of the Department's decision is pending before this court.  *See Sierra Club v. Department of Energy*, No. 15-1489.

their NEPA claim has been mooted by additional environmental analyses conducted by the Department of Energy as part of its own public-interest review. Neither argument succeeds.

**A**

An association will have standing if "(1) at least one of its members would have standing to sue in [its] own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). There is no dispute that the environmental claims the Associations assert are germane to their institutional purposes, or that the relief sought under the Administrative Procedure Act does not require the participation of individual members. The question of individual-member injury is where the rub is.

It is settled law that "an agency's failure to prepare (or adequately prepare) an [Environmental Impact Statement] before taking action with adverse environmental consequences" constitutes the "archetypal procedural injury" redressable under Article III. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013); *see Florida Audubon Society v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (en banc). The bottom-line standing question in this case, then, is whether one of either Association's members faces a concrete injury that is "tethered to" the Commission's decision to authorize the Freeport Projects' construction or operation notwithstanding the Commission's allegedly inadequate NEPA review, *WildEarth Guardians*, 738 F.3d at 305. *See also Florida Audubon Society*, 94 F.3d at 668.

At least one Sierra Club member has risen to that task, and that is all that Article III requires. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."); *Americans for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013). Teresa Cornelison is a member of the Sierra Club and lives "approximately 0.5 miles from the Freeport LNG facility." Pet. Add. A-18. She has attested that "the additional noise made during construction will * * * hinder [her] enjoyment of [her] home," and that "[i]f the terminal were built, [she] would not go outside to relax or walk on the beach as frequently because of the noise from * * * the construction of the facility[.]" *Id.* at A-19. Such credible claims of exposure to increased noise and its disruption of daily activities, backed up by specific factual representations in an affidavit or declaration, are sufficient to satisfy Article III's injury-in-fact requirement. *See Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 684–685 (D.C. Cir. 2004). That aesthetic injury, moreover, is linked directly to the Commission's authorizations of the Freeport construction projects. *See, e.g.*, J.A. 1192 (Order Granting Authorizations) ("Land access within the Phase II Modification Project site * * * would require development of an approximately 7,000-foot-long plant road system [and] * * * 3,180 feet [of the plant road system] would require new construction."). That satisfies Article III.

The Commission says that is not enough, and that the Associations also must tie their injury to the specific "increase[]" in "natural gas production that was [allegedly] caused by the challenged FERC orders." Resp. Br. 24. That argument "slice[s] the salami too thin." *WildEarth Guardians*, 738 F.3d at 307. As we have held before, we hold again: it is sufficient for standing purposes that the "aesthetic

injury follows from an inadequate [Environmental Impact Statement] whether or not the inadequacy concerns the same environmental issue that causes their injury." *Id.* In NEPA procedural-injury cases, an "adequate causal chain" contains two links: "one connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an [adequate] EIS," and "one connecting that substantive decision to the plaintiff's particularized injury." *Florida Audubon Society*, 94 F.3d at 668.

That is to say, regardless of *how* the Commission allegedly failed to discharge its NEPA obligation, that failure led directly to authorization of the Freeport Projects, which in turn is the source of Cornelison's injury. The proof is in the pudding: if we were to vacate the Commission's order authorizing the Freeport Projects for violating NEPA, not only would Cornelison's injuries be redressed, the remedy would also be "'limited to the inadequacy'—here, a deficient [Environmental Impact Statement]—'that produced the injury in fact that the [petitioners] ha[ve] established.'" *WildEarth Guardians*, 738 F.3d at 307 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)).

The Commission's reliance on *National Committee for the New River, Inc. v. FERC*, 433 F.3d 830 (D.C. Cir. 2005), fares no better. That case, which did not involve NEPA, held that the environmental and aesthetic harms alleged had to be linked to "the route realignments themselves" because route realignments were what the challenged agency action authorized. *Id.* at 832. Here, the specific agency action being challenged is the NEPA analysis. And Cornelison has grounded her injury in that flawed NEPA analysis and its end product that injures her: construction of the projects.

**B**

Next is mootness. In 2014, the Department of Energy, "in response to challenges raised by Sierra Club and other commenters in the Freeport LNG Export proceeding and other export proceedings pending at the Department of Energy," issued two informational reports that "evaluated specific environmental aspects of the LNG production and export chain." Resp. Br. 28–29. On that basis, the Commission asserts that the Associations' petition is moot.

That argument woefully misunderstands the Associations' claim. They do not seek some quantum of additional environmental information for its own sake, nor are they, *in this case*, challenging the Department of Energy's analysis of environmental consequences. Their argument is that the Commission bungled its NEPA review by failing to consider the specific indirect and cumulative effects that the Associations identified. The Department of Energy's additional reports do not remedy that problem. *See* Pet. Reply Br. 9 ("The Department of Energy's reports played no part in the Commission's decision-making, and did not include the procedures and substance required under NEPA to ensure that environmental considerations inform such decision-making."). The Associations' hope is that, if the Commission were to consider those factors, perhaps it would reach a different conclusion on whether the Freeport Projects are consistent with the public interest. After all, "[t]he idea behind NEPA is that if the agency's eyes are open to the environmental consequences of its actions and if it considers options that entail less environmental damage, it may be persuaded to alter what it proposed." *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008).

In short, because the Commission's NEPA analysis was an integral component of authorizing the export construction projects—without which the Department of Energy's separate export authorization would be pointless—and because, if error occurred, the Commission might come to a different result on remand, the lawfulness of the Commission's action remains very much a live legal issue.

**III**

Before addressing the merits of the Associations' NEPA claim, we pause to underscore what we are *not* deciding in this case. Because the Associations do not challenge the propriety or scope of the Commission's delegated authority under the Natural Gas Act, or the interplay between the Commission and the Department of Energy when the former is acting as the "lead agency" in reviewing the environmental effects of a natural gas export operation under NEPA, we take those agency roles as we find them. *See* 15 U.S.C. § 717n(b)(1); *see also* 42 U.S.C. § 7172(a)(2)(B). Nor have the Associations argued that the Commission impermissibly "segmented" its review of the Freeport Projects from the larger inter-agency export authorization process, and "thereby fail[ed] to address the true scope and impact of the activities that should be under consideration," *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014); *id.* at 1314 ("[T]he rule against segmentation * * * 'prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'") (alteration in original) (quoting *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988)).

We also express no opinion on whether (i) the Commission's environmental analysis would have been adequate to satisfy the Department of Energy's own independent NEPA obligation in authorizing Freeport to export natural gas; or (ii) the Commission's construction authorizations and the Department's export authorizations qualified as "connected actions" for purposes of NEPA review, *see* 40 C.F.R. § 1508.25(a)(1). As the Associations acknowledged at oral argument, Tr. of Oral Arg. at 20–21 (Nov. 13, 2015), objections concerning the environmental consequences stemming from the actual export of natural gas from the Freeport terminal, including increased emissions and induced production, are raised in their parallel challenge to the Department of Energy's order authorizing Freeport to export natural gas to non-free trade countries. Because the Natural Gas Act places export decisions squarely and exclusively within the Department of Energy's wheelhouse, any such challenges to the environmental analysis of the export activities themselves must be raised in a petition for review from the Department's decision to authorize exports.

Accordingly, we limit our analysis in this case solely to whether the Commission discharged its NEPA duty to adequately consider the indirect and cumulative environmental effects of authorizing the "siting, construction, expansion, [and] operation" of the Freeport Projects. 15 U.S.C. § 717b(e)(1). On that front, the Associations argue that the Commission's NEPA analysis fell short in three respects. *First*, they contend that the Commission failed adequately to consider the Freeport Projects' indirect effect of inducing increased domestic gas production and prompting greater reliance on coal as a fuel source. *Second*, they contend that the Commission failed adequately to analyze the cumulative environmental effects of the Freeport Project when combined with other export projects nationwide that

either recently had been approved or were still pending. *Third*, the Associations claim that, by measuring certain emissions in pounds per megawatt-hour rather than tons per year, the Commission understated the full extent of the Projects' emissions. Pet. Br. 38.

In reviewing the Associations' challenges, our task is not to "flyspeck" the Commission's environmental analysis for "any deficiency no matter how minor." *Theodore Roosevelt Conservation Partnership v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011). Our job is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97–98 (1983); *see also Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) (If an agency's NEPA analysis is "fully informed and well considered, it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment."). None of the Associations' challenges can survive that deferential standard of review.

**A**

NEPA obligated the Commission to factor into its environmental analysis not just the direct, but also the indirect, environmental effects of the Freeport Projects' construction and operation—that is, those effects that are "later in time or farther removed in distance," yet "reasonably foreseeable." *Department of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004); *see* 40 C.F.R. § 1508.8. That does not mean that the Commission had to examine everything for which the Projects could conceivably be a but-for cause. *See Public Citizen*, 541 U.S. at 767; *Village of Bensenville v. FAA*, 457 F.3d 52, 65 (D.C. Cir. 2006) ("Even under NEPA, a

'but for' causal relationship is insufficient to make an agency responsible for a particular effect.") (internal quotation marks omitted).  Instead, the effect must be "'sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision.'"  *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005) (quoting *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)).  NEPA thus "requires a reasonably close causal relationship' between the environmental effect and the alleged cause," which is analogous to "the 'familiar doctrine of proximate cause from tort law.'"  *Public Citizen*, 541 U.S. at 767.

Additionally, the Commission's NEPA analysis did not have to address the indirect effects of the anticipated *export* of natural gas.  That is because the Department of Energy, not the Commission, has sole authority to license the export of any natural gas going through the Freeport facilities.  In the specific circumstances where, as here, an agency "has no ability to prevent a certain effect due to" that agency's "limited statutory authority over the relevant action[]," then that action "cannot be considered a legally relevant 'cause' of the effect" for NEPA purposes.  *Public Citizen*, 541 U.S. at 771.

The Associations argue that the Commission should have factored in the increase in domestic natural gas production that, in their view, the Freeport Projects would induce.  But that challenge again focused on the impact of natural gas *exports* from the Freeport Projects on domestic production, and export effects do not fall within the Commission's bandwidth.  To the extent that the Associations' argument focuses on induced production from domestic operations, we disagree.  The Commission reasonably explained that the asserted linkage was too attenuated to be weighed in its particular NEPA analysis.

In particular, the Commission found no evidence that the Projects by themselves would lead to increased gas production because "no specific shale-play [had] been identified as a source of natural gas for" the Projects. J.A. 1209. More importantly, there was no evidence suggesting that the gas to be processed in the Freeport facility, independent of the export authorization, would "come from future, *induced* natural gas production, as opposed to from existing production, particularly in light of the longtime, extensive natural gas development that has already occurred in Texas, including in its shale areas." *Id.* at 1270 (emphasis in original). Accordingly, the Commission concluded that the "potential environmental effects associated with additional natural gas production [were not] sufficiently causally related to the Freeport LNG Projects to warrant a detailed analysis." *Id.*

The Associations level two objections to the Commission's reasoning, but neither surmounts the high hurdle of demonstrating arbitrary and capricious decision-making.

*First*, the Associations says it is "self-evident" under "[b]asic economic principles" that authorizing the Freeport Projects will lead to the Department of Energy granting an export license, which in turn will increase domestic gas production and the price of domestic natural gas, which next will drive consumers toward cheaper energy sources, including more environmentally harmful products like coal. That increase in both gas production and coal use will, according to the Associations, cause domestic greenhouse gas and ozone emissions to rise. Pet. Br. 23; *see id*. at 21–23.

Perhaps. But critical to triggering that chain of events is the intervening action of the Department of Energy in

granting an export license. The Department's independent decision to allow exports—a decision over which the Commission has no regulatory authority—breaks the NEPA causal chain and absolves the Commission of responsibility to include in its NEPA analysis considerations that it "could not act on" and for which it cannot be "the legally relevant cause." *Public Citizen*, 541 U.S. at 769.

The Associations rely on the Eighth Circuit's decision in *Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520 (2003). In that case, the court found inadequate the Surface Transportation Board's Environmental Impact Statement analyzing the construction and rehabilitation of hundreds of miles of railroad lines for the transportation of coal. *Id.* at 532. The project was anticipated to make an additional 100 million tons of coal available for annual usage, yet the Board failed to factor the environmental effects of that known increase in coal usage into its analysis. The Eighth Circuit concluded that, even if the full extent of the environmental impact of the increased coal usage was not known, the nature of the ensuing environmental effects plainly was—indeed, it had been identified by the Board itself. *Id.* at 549. "[W]hen the *nature* of the effect is reasonably foreseeable but its *extent* is not," the court concluded, an agency "may not simply ignore the effect" in its NEPA review. *Id.* (emphasis in original).

Even assuming the correctness of a decision that does not bind this circuit, this case looks nothing like *Mid States*. Here, the Associations have not identified any specific and causally linear indirect consequences that could reasonably be foreseen and factored into the Commission's environmental analysis that exist apart from the intervening Department of Energy decision to authorize exports.

*Second*, the Associations say the Commission acted arbitrarily and capriciously by not taking sufficient account of the Energy Information Administration's 2012 report on the "Effect of Increased Natural Gas Exports on Domestic Energy Markets," which (according to the Associations) "specifically predicted the extent to which LNG exports from the Gulf Coast would increase gas production and coal use." Pet. Br. 23; *see generally* U.S. ENERGY INFORMATION ADMIN., EFFECT OF INCREASED NATURAL GAS EXPORTS ON DOMESTIC ENERGY MARKETS 1, 3 (Jan. 2012) ("2012 Report"). Again, that argument treads on environmental consequences tied to the Department of Energy's export authorization that, under *Public Citizen*, fall outside the Commission's NEPA wheelhouse.

In rejecting the Associations' challenges, we are mindful that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based," *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), and that the Commission did not explicitly consider the extent to which *Public Citizen* placed the Associations' asserted export-intertwined effects outside of the Commission's NEPA duties. But *Chenery*'s restriction on our review of an agency's order "'is to be understood with a qualification; the order must be judged upon the grounds upon which the action was based, unless the appellate court concludes that the decision 'already made * * * should properly be based on another ground within the power of the appellate court to formulate'"—that is, one that "does not depend upon a factual determination or a policy judgment that [the agency] alone is authorized to make." *Shea v. Director, Office of Workers' Comp. Programs, United States Dep't of Labor*, 929 F.2d 736, 739 n.4 (D.C. Cir. 1991) (quoting *Chae-Sik Lee v. Kennedy*, 294 F.2d 231, 234 (D.C. Cir.), *cert. denied sub nom.*, *Lee v. Kennedy*, 368 U.S. 926 (1961)); *see*

*Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304 (D.C. Cir. 2015) (*Chenery* applies only to "determinations specifically entrusted to an agency's expertise," not "legal principles" of the sort "that a court usually makes").

Our decision here follows not from *de novo* factual findings or independent policy judgments, but from our interpretation of NEPA and binding Supreme Court precedent—neither of which trenches upon a "determination specially entrusted to [the Commission's] expertise." *Canonsburg Gen. Hosp.*, 807 F.3d at 304; *see New York New York, LLC v. NLRB*, 313 F.3d 585, 590 (D.C. Cir. 2002) ("We are not obligated to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other principle.") (internal quotation marks omitted); *Grand Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002) ("[T]he court owes no deference to [an agency's] interpretation of NEPA * * * because NEPA is addressed to all federal agencies and Congress did not entrust administration of NEPA to [any one agency] alone.").

The Supreme Court's decision in *Public Citizen* is explicit that the Commission was not obligated to consider those effects of the Freeport Projects that could only occur after intervening action by the Department of Energy or Congress and that only those actors—and not the Commission—had the authority to prevent. Based on the record before us and the Associations' arguments, we cannot conclude that the Commission's analysis of the Projects' indirect effects, separate and apart from exporting, was arbitrary or capricious.

**B**

In addition to addressing reasonably foreseeable indirect effects, NEPA obligated the Commission to consider the

"cumulative impact[s]" on the environment—that is, "the incremental impact of the [Freeport Projects] when added to other past, present, and reasonably foreseeable future actions[.]" 40 C.F.R. § 1508.7. To that end, a cumulative-impact analysis must identify (i) the "'area in which the effects of the proposed project will be felt'"; (ii) the impact expected "'in that area'"; (iii) those "'other actions—past, present, and proposed, and reasonably foreseeable'" that have had or will have impact "'in the same area'"; (iv) the effects of those other impacts; and (5) the "'overall impact that can be expected if the individual impacts are allowed to accumulate.'" *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (quoting *Grand Canyon Trust*, 290 F.3d at 345).

The Commission identified the relevant geographic area for its cumulative-impact analysis as Brazoria County, Texas, the 1,600-square-mile county in which the Freeport Projects would be located and in which "the predominance of environmental impacts" associated with the Projects' construction and operation would occur. J.A. 978. Such a determination of the size and location of the relevant geographic area "requires a high level of technical expertise," and thus "is a task assigned to the special competency of" the Commission. *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 414 (1976). The Commission then catalogued and analyzed the cumulative environmental effects of the Freeport Projects with "[m]ajor current and proposed developments" in the County, including industrial, port and harbor channel, pipeline, oil and gas field, land and air transportation, commercial, residential, and other miscellaneous developments. J.A. 980.

The Associations voice no complaint about the analysis of the Projects' cumulative impact within Brazoria County.

Their objection, instead, is that the Commission should have undertaken a nationwide analysis that included applications for several other liquefied natural gas export terminals that were pending or had already been granted across the United States. Pet. Br. 35 & n.21.

That draws the NEPA circle too wide for the Commission. A NEPA cumulative-impact analysis need only consider the "effect of the current project along with any other past, present or likely future actions *in the same geographic area*" as the project under review. *TOMAC*, 433 F.3d at 864 (emphasis added); *Grand Canyon Trust*, 290 F.3d at 345 (NEPA "cumulative impacts" applies to "impacts in the same area").

The Associations point to the Supreme Court's direction in *Kleppe* that, "when several proposals for * * * related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together," 427 U.S. at 410. But the key language there is "upon a region." *Id.* There is no dispute that the Commission considered the cumulative effects of the Freeport Projects that it was authorizing within its designated county-wide region. Importantly, the Supreme Court went on in *Kleppe* to confirm that an agency's NEPA obligations are not uncabined: "[P]ractical considerations of feasibility might well necessitate restricting the scope" of an agency's analysis. *Id.* at 414.

That is not to say that the nature of a particular agency action would never warrant a nationwide cumulative-impact analysis. *See Grand Canyon Trust*, 290 F.3d at 345 (cumulative impact analyses must identify "the area in which the effects of the proposed project will be felt"). But given

the scant record evidence identifying any reasonably foreseeable and proximate effects of the Freeport Projects themselves (separate from their exports) on national energy markets or emission levels, we hold that the Associations have not shown that the Commission acted arbitrarily or capriciously in analyzing the cumulative effects of the Freeport Projects. *See Minisink Residents for Environmental Preservation and Safety v. FERC*, 762 F.3d 97, 113 (D.C. Cir. 2014) (upholding cumulative-impact analysis finding "no significant *cumulative* impacts were expected" where the "[p]roject *itself* was expected to have minimal impacts").

## C

Lastly, the Associations fault the Commission for quantifying emissions from the Projects' electricity use in pounds per megawatt-hour instead of in tons per year. We lack jurisdiction to entertain that argument.

The Natural Gas Act is explicit that "[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 15 U.S.C. § 717r(b). That requirement is a "'jurisdictional prerequisite[] to judicial review.'" *Moreau v. FERC*, 982 F.2d 556, 562–563 (D.C. Cir. 1993) (quoting *Public Serv. Comm'n v. Federal Power Comm'n*, 543 F.2d 757, 774 n.116 (D.C. Cir. 1974)); *see also NO Gas Pipeline v. FERC*, 756 F.3d 764, 768–769 (D.C. Cir. 2014).

That obligation to raise objections before the Commission first is redoubled under NEPA because "[p]ersons challenging an agency's compliance with NEPA must structure their participation so that it * * * alerts the agency to the [parties'] position and contentions," and failure

to do so "forfeit[s] any objection" to the environmental analysis on that ground. *Public Citizen*, 541 U.S. at 764 (internal quotation marks omitted).

At no point in the proceedings below, including the rehearing stage, did the Associations contend that the Commission should use the tons-per-year metric. In fact, in its comments to the Commission's draft statement, Sierra Club specifically directed the Commission to a database that "conveniently" quantified emission rates using the same pounds-per-megawatt-hour metric that it now faults the Commission for employing. J.A. 432. Because the "tons per year vs. pounds per megawatt-hour" argument was not raised before the Commission, it cannot be considered here.

## IV

In sum, we hold that at least one of the Associations' members has standing, and that the case is not moot. On the merits, we reject the Associations' challenges to the Commission's NEPA review of the Freeport Projects, separate and apart from any environmental effects associated with the Department of Energy's independent decision to authorize exports.

*It is so ordered.*