# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

**No. 22-5295**  **September Term, 2023**

FILED ON: June 21, 2024

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
            APPELLANTS

v.

NATIONAL MARINE FISHERIES SERVICE AND GINA RAIMONDO, IN HER OFFICIAL CAPACITY AS
SECRETARY OF COMMERCE,
            APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-00930)

———

Before: HENDERSON, WALKER and PAN, *Circuit Judges*

## J U D G M E N T

We heard this appeal on the record from the United States District Court for the District of Columbia and the parties' briefs and arguments. We fully considered the issues and determined that a published opinion is unnecessary. *See* D.C. CIR. R. 36(d).

For the reasons set forth below, we **AFFIRM** the district court's grant of summary judgment.

\* \* \*

In 2019, the National Marine Fisheries Service issued a new rule to protect sea turtles. Three environmental groups challenged it. Contrary to their arguments related to the Administrative Procedure Act, the rule was reasonably explained and was a logical outgrowth of the proposal that preceded it. In addition, their argument related to the National Environmental Policy Act fails. We therefore affirm the district court's decision to grant summary judgment to the Fisheries Service.

## I. Background

The Endangered Species Act protects "endangered" and "threatened" species. *See* 16 U.S.C. § 1531(b). One way the Act protects covered species is by making it unlawful to "take" those

species.  *Id.* § 1538(a)(1)(B).  So, as a general matter, no one can "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a protected animal, or "attempt to engage in any such conduct."  *Id.* § 1532(19).

Federal agencies may "promulgate such regulations as may be appropriate" to protect against the unlawful taking of a protected animal.  *Id.* § 1540(f); *see also* 50 C.F.R. § 222.101(a).[1]  For protected marine animals like the sea turtles at issue in this case, a relevant agency is the National Marine Fisheries Service.  Its regulations clarify that "otherwise prohibited" takings are permissible if they are "incidental to . . . an otherwise lawful activity."  16 U.S.C. § 1539(a)(1)(B).

One such lawful activity is commercial fishing, including shrimping.  *See* 50 C.F.R. § 223.206(d) (allowing the "incidental" taking of protected sea turtles "during fishing" so long as the fishers are in compliance with certain regulations).  Incidental takings occur when shrimpers cast trawl nets into the sea and accidentally ensnare sea turtles.  If the sea turtles cannot escape, they drown.  But trawl nets can be fitted with a "turtle excluder device," which "is a grid . . . that mechanically separates sea turtles . . . from the net through an escape opening."  JA 311.

The Fisheries Service regulations have never required *every* shrimper to use a turtle exclusion device.  Before 2019, deep-water shrimpers using "otter trawls" were required to install turtle excluder devices, but shallower-water shrimpers using "skimmer trawls," "pusher-head trawls," and "butterfly trawls" were not.[2]  *Center for Biological Diversity v. National Marine Fisheries*

---

[1] The decision to put animals on the endangered-species list is different than the decision to promulgate appropriate regulations after an animal is on the list.  The government does not consider economic impacts when it lists an animal as endangered.  *See* 16 U.S.C. § 1533(b)(1)(A).  But the government does consider economic impacts when it decides on "appropriate" regulations to guard against incidental takings of a listed species.  *Id.* § 1540(f).  By limiting the government to "appropriate" regulations, the statute allows and arguably requires consideration of those costs.  *Id.*; *cf. Michigan v. EPA*, 576 U.S. 743, 752 (2015) ("No regulation is 'appropriate' if it does significantly more harm than good.").  The government's longstanding practice has been to consider costs when regulating incidental takings.  *See, e.g.*, Taking of Marine Mammals Incidental to Commercial Fishing Operations; Atlantic Large Whale Take Reduction Plan Regulations, 62 Fed. Reg. 39157, 39159 (July 22, 1997) (The Fisheries Service "has identified two approaches for reducing the risk of serious injury or mortality to right whales . . . . One approach . . . would guarantee reduction of entanglements causing serious injury and mortalities but only at a high cost to many fishermen.  The second approach . . . does not carry the guarantee of the first approach but it is calculated to have a reasonable chance for success . . . while minimizing costs to the fishery."  The Fisheries Service "adopts the second approach.").  In this case, the environmental groups concede that such a practice is appropriate.  *See* Oral Arg. Tr. 5 (Appellants: "we don't disagree that economic impacts are relevant").

[2] Deep-water shrimpers "operate[ ] out of large, commercial vessels in deeper waters offshore; these vessels predominantly fish using nets called otter trawls," which use boards to hold the net open as it is pulled through the water.  *Center for Biological Diversity v. National Marine Fisheries Service*, 628 F.Supp.3d 189, 196 (D.D.C. 2022).  Other shrimpers sail closer to shore, and many of them use skimmer trawls, pusher-head trawls, or butterfly trawls.  Of these three, skimmer trawls are the most common.  Unlike otter trawls, skimmer trawls are "elevated out of the water while being towed, to prevent shrimp from jumping over the top of the net and escaping."  *Id.*

*Service*, 628 F.Supp.3d 189, 196 (D.D.C. 2022).

The Fisheries Service proposed a new rule about turtle excluder devices in 2016. The proposal considered seven regulatory options. The options ranged from preserving the status quo; to requiring additional shrimpers to use turtle excluder devices based on vessel length, type of trawl used, and fishing location; to requiring all shrimpers to use turtle excluder devices. Among those options, the Fisheries Service preferred one of the most expensive, which required all shrimpers using skimmer trawls, pusher-head trawls, or butterfly trawls to use turtle excluder devices.

After commenters expressed concern about the economic impact of the proposed rule, the Fisheries Service promulgated a more modest final rule in 2019. That final rule required only shrimpers using skimmer trawls on vessels at least 40 feet in length to use turtle excluder devices.

In the view of three environmental organizations, the 2019 final rule should have covered at least as many shrimpers as the 2016 proposed rule. They sued the Fisheries Service, arguing that (1) the rule was arbitrary and capricious because it was inadequately explained; (2) it was not a logical outgrowth of the proposed rule that preceded it; and (3) the Fisheries Service was required by the National Environmental Protection Act to conduct a species-by-species analysis of the protected turtle populations, rather than an analysis of the aggregate population of protected turtles. *Id.* at 208-09.

The district court awarded summary judgment to the Fisheries Service. *Id.* at 219.

The environmental organizations appealed.

## II. The Final Rule Is Not Arbitrary and Capricious

Courts shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Administrative Procedure Act's "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). We do not set aside agency action when the agency has adequately "explained its logic and the policies underlying its choices." *North America's Building Trades Unions v. OSHA*, 878 F.3d 271, 303 (D.C. Cir. 2017) (cleaned up). Nor do we penalize an agency simply because it first proposed a broad rule and then later adopted a narrower rule. *See Northeast Maryland Waste Disposal Authority v. EPA*, 358 F.3d 936, 950-51 (D.C. Cir. 2004).

The 2019 final rule was not arbitrary and capricious. Although it did not cover as many shrimpers as the 2016 proposed rule that preceded it, that 2016 proposal was "preliminary." And it was followed by comments urging the Fisheries Service to impose a smaller economic burden on the fishing industry. Agencies "are free — indeed, they are encouraged — to modify proposed rules as a result of the comments they receive." *Id.* at 951.

3

The Fisheries Service's final rule reflects a policy choice, which was adequately explained by its consideration of the rule's costs and benefits. *See North America's Building Trades Unions*, 878 F.3d at 302-03. Under the final rule, up to 1,158 sea turtles will be saved each year, at an annual cost of $3.7 million. While the proposed rule was projected to save more than twice as many sea turtles, it would have imposed nearly four times the cost on the shrimping industry.

When balancing those projected costs and benefits, the final rule explains that the covered vessels are "expected to encounter sea turtles on the fishing grounds more frequently than smaller, part-time vessels." JA 323. The rule also explains that the shrimpers on those full-time, larger vessels can better absorb compliance costs. And it explains that a rule reaching only certain vessels "can be implemented in far less time than the proposed rule, allowing for more focused and expedient sea turtle conservation." JA 427. Considered together, those explanations were reasonable.[3]

To be sure, the environmental groups believe more sea turtles should be protected even at the expense of shrimpers. But the environmental groups concede that the Fisheries Service was allowed to consider the industry's compliance costs. Oral Arg. Tr. 5 ("we don't disagree that economic impacts are relevant"). And our role is not to decide who has the better policy argument. The Fisheries Service's reasonable explanation of its reasonable decision leaves this court with "no basis for second-guessing" the final rule. *North America's Building Trades Unions*, 878 F.3d at 303.[4]

### III. The Final Rule Is A Logical Outgrowth of the Proposed Rule

We next address whether the 2019 final rule was a logical outgrowth of the 2016 proposed rule. *See* 5 U.S.C. § 553(b)(3). Under the logical-outgrowth rule, "the final rule the agency adopts must be a logical outgrowth of the rule proposed." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (cleaned up). But agencies are not required "to select a final rule from among the precise proposals under consideration during the comment period." *Sierra Club v. Costle*, 657 F.2d 298, 352 (D.C. Cir. 1981). Rather, it "is entirely proper and often necessary for the agency to continue its deliberations and internal decisionmaking process after the close of public comment in order to assimilate those comments and arrive at a policy choice." *Id.* at 352-53.

The 2019 final rule was a logical outgrowth of the 2016 proposed rule. The Fisheries

---

[3] The environmental groups also argue that the Fisheries Service used a 2018 report about sea turtles in a way that was arbitrary and capricious. We disagree. The study increased previous estimates about the *percentage* of sea turtle deaths attributable to shrimpers using skimmer trawls, while also concluding that the *total number* of sea turtle deaths attributable to shrimpers is smaller than previously believed. Because the 2019 rule increases the number of shrimpers required to use turtle excluder devices, we find no fault with the agency citing that report to support its rule — even if the rule does not cover as many shrimpers as the environmental groups would prefer.

[4] In addition to citing cost concerns, the Fisheries Service also cited safety concerns when explaining why the rule would not cover smaller boats. But even without that consideration, the rule was reasonable and reasonably explained.

4

Service's proposal made clear that it intended to account for both sea turtle conservation and the economic impact of its proposed regulations, and it sought comments. By listing alternative regulations based on vessel length or type of trawl used, the 2016 proposed rule put interested parties on notice that the Fisheries Service was considering those two factors as relevant. And the final rule fell squarely within the range of options in the proposed rule, which contemplated anything from maintaining the status quo to requiring all shrimpers to use turtle excluder devices.

That is all the Fisheries Service needs to show. It requires "no great leap of logic or imagination to contemplate that the ultimate outcome of [a] rulemaking might be no rule, or only partial adoption of the proposed comprehensive rule." *Association of American Railroads v. DOT*, 38 F.3d 582, 589 (D.C. Cir. 1994). Because the final rule was a "partial adoption of the proposed comprehensive rule" within the scope of the alternatives set forth by the proposed rule, it is a logical outgrowth of the proposed rule. *Id.*; *see also Arizona Publishing Service Co. v. EPA*, 211 F.3d 1280, 1299-300 (D.C. Cir. 2000).

## IV. The Environmental Organizations' Claim Regarding the National Environmental Policy Act Fails

Finally, the environmental organizations argue that 2019 final rule violated the National Environmental Policy Act by not listing the benefits to each protected species of sea turtles.[5] *See* 42 U.S.C. § 4321 *et seq.*; *see also Sierra Club v. FERC*, 38 F.4th 220, 226 (D.C. Cir. 2022) (citing 40 C.F.R. §§ 1502.14, 1502.16, 1501.3(a)(3)). Instead, the final rule listed the benefits to protected sea turtles as a whole. But regardless of whether that objection has merit, the environmental groups forfeited it because they failed to raise it during the administrative process. *See Sierra Club v. FERC*, 827 F.3d 36, 50-51 (D.C. Cir. 2016) (quoting *DOT v. Public Citizen*, 541 U.S. 752, 764-65 (2004) (cleaned up)) (if a party fails to challenge the "agency's compliance with NEPA" by alerting "the agency to the parties' position and contentions" at the outset, the party also "forfeit[s] any objection to the" environmental analysis on that ground).

The environmental organizations note that the Fisheries Service failed to argue forfeiture before the district court, thereby forfeiting its forfeiture argument. Even if that is so, we find no reversible error in the district court's conclusion that the environmental organizations' NEPA argument is unavailing. *See Center for Biological Diversity*, 628 F.Supp.3d at 216-19.

## V. Conclusion

We affirm the district court.

This disposition is unpublished. *See* D.C. CIR. R. 36(d). We direct the Clerk to withhold this mandate until seven days after resolution of a timely petition for panel or en banc rehearing. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41(a)(1).

---

[5] The Kemp's ridley sea turtle, the leatherback sea turtle, the hawksbill sea turtle, the green sea turtle, and the loggerhead sea turtle are each relevant protected species in this case. *Center for Biological Diversity*, 628 F.Supp.3d at 199.

**Per Curiam**

                                **FOR THE COURT:**
                                Mark J. Langer, Clerk

BY:    /s/
         Daniel J. Reidy
         Deputy Clerk